IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FAYE E. CURRY | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MICHAEL J. ASTRUE, | : | No. 07-5237 |
| COMMISSIONER OF THE | : | |
| SOCIAL SECURITY ADMINISTRATION | : | |

**MEMORANDUM RE: SOCIAL SECURITY APPEAL**

**Baylson, J.**                                                                                          **January 26, 2009**

Plaintiff, Faye E. Curry ("Curry," "Plaintiff") seeks judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner," "Defendant") denying her application for the Supplemental Security Income ("SSI") disability program under the Social Security Act ("the Act"), 42 U.S.C. §§ 1381-1383(c) (2000). Jurisdiction is established under § 405(g) of the Act. For the reasons that follow, the Court will deny Curry's motion and affirm the decision of the Commissioner.

I.     **Background and Procedural History**

   A.     **Procedural History**

Curry is a 53 year-old female who is able to communicate in English and has completed the twelfth grade. (R. 37, 53). Under the Commissioner's regulations, Curry is currently classified as a person "closely approaching advanced age," 20 C.F.R. §§ 404.1563, 416.963 (2008), though at the time her application was filed in 2005 she was considered a "younger person," id.

Curry protectively filed an application for SSI benefits on August 4, 2005.[1]  (R. 17, 37). The State Agency that reviewed her application denied her claim after determining that she did not have any impairments which significantly limited her work ability.  (R 21).  Curry's application was also denied by the Commissioner on September 14, 2005.  (R. 17, 29).  Curry, not represented by counsel, filed a timely request for a hearing before an Administrative Law Judge ("ALJ") on October 12, 2005 (R. 17, 28); she later waived the right to appear before the ALJ and permitted the ALJ's decision to be made solely on the record (R. 25).

On December 15, 2006, ALJ Janice C. Volkman rendered her decision, finding that Curry was not disabled for the purpose of the SSI application.  (R. 17-22).  Specifically, the ALJ found, contrary to the State Agency's decision, that Curry has severe impairments which limit her to the residual functional capacity of the full range of light work.  (R. 19-21).  However, the ALJ concluded, after considering Curry's age, education, work experience, and her residual functional capacity and without consulting a vocational expert, that "there are jobs in significant numbers in the national economy" that Curry could perform according to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and denied her request for benefits.  (R. 21-22).

Curry filed a timely appeal with the Appeals Council on January 24, 2007.  (R. 11-13). After an extension of time was granted to permit her counsel to gather the necessary evidence and prepare for the appeal, (R. 6-7, 9-10), the Appeals Council determined that there was no reason to review the decision of the ALJ and denied the appeal (R. 3).  Curry subsequently filed a complaint in this Court seeking judicial review of the Commissioner's decision on December 14,

---

[1] Curry filed a prior application for SSI benefits on August 16, 2004.  (R. 17).  That application was denied on October 27, 2004, and Curry did not appeal the denial.  (R. 17).

2007. (Doc. 3). Curry, now represented by counsel, moved for summary judgment on the appeal. (Doc. 8). After reviewing the documents in the record in preparation for a decision, this Court entered an Order directing Curry to state what additional evidence would have been presented to the ALJ had Curry been represented by counsel at the administrative level. (Doc. 11). The additional briefing has been received and reviewed, and Curry's motion for summary judgment is now ripe for decision.

### B. Plaintiff's Work History

Beginning in 1994, Curry's work history includes two jobs. First, from 1994 until 1999, Curry was employed as a housekeeper and cleaner, maintaining both private homes and a sports arena for four hours per day, five days per week. (R. 50). While seemingly inconsistent with the number of hours worked, Curry stated that each day she walked four hours, stood four hours, climbed four hours, stooped four hours, kneeled three hours, crouched three hours, reached four hours, and wrote/typed/handled small objects four hours. (R. 51).[2] She also stated that she frequently lifted 25 pounds. (R. 51). In 2001, Curry began employment as a child sitter, working eight hours per day and five days per week. (R. 50). As of January 1, 2002, however, Curry was no longer working; she noted that she stopped performing daycare services due to being fired. (R. 50). Besides these two positions, Curry has not provided any other employment history.

### C. Plaintiff's Medical Conditions and Treatment

In Curry's application for SSI benefits, she stated that she was disabled due to an irregular heartbeat, asthma, and hepatitis C. (R. 49-50). After conducting a review of the record, the ALJ

---

[2] Though a misunderstanding of the question may have contributed to this answer, the information provided is not relevant to this Court's analysis.

found the additional potential conditions of high blood pressure, substance abuse, chronic obstructive pulmonary disease ("COPD"), neuropathy, and back pain. (R. 17, 19). Curry stated that these disabilities began on June 14, 2004, though a specific reason for the onset is undisclosed by Curry or her medical records. (R. 50). The record does not contain a disability determination by a treating physician.

## II.     Jurisdiction and Standard of Review

The Social Security Act provides for judicial review by this Court of any "final decision of the Commissioner of Social Security" in a disability proceeding. 42 U.S.C. § 405(g). A district court may enter a judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." Id.

On judicial review of the decision, the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." Id. (emphasis added). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion . . . .'" Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005) (quoting Reefer v. Barnhart, 326 F.3d 376, 379 (3d Cir. 2003)). Substantial evidence is "'more than a mere scintilla but may be somewhat less than a preponderance of the evidence.'" Rutherford, 399 F.3d at 552 (quoting Ginsburg v. Richardson, 436 F.2d 1146, 1148 (3d Cir. 1971)). In reviewing the record for substantial evidence, however, this Court must "not 'weigh the evidence or substitute [its own] conclusions for those of the fact-finder.'" Rutherford, 399 F.3d at 552 (quoting Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992)). The substantial evidence standard "is deferential and includes deference to inferences drawn from the facts if they, in turn, are

supported by substantial evidence." Schaudeck v. Comm'r of S.S.A., 181 F.3d 429, 431 (3d Cir. 1999).

As for the legal standards applied in the case, this Court's review is plenary. See Allen v. Barnhart, 417 F.3d 396, 398 (3d Cir. 2005).

**III.  Discussion**

Curry raises several objections to the ALJ's analysis and conclusions. First, she argues that the ALJ erred by not requiring an updated consultative examination or a residual functional capacity assessment prior to coming to her conclusion. Second, she argues that the ALJ inappropriately rejected her subjective complaints of the symptoms of her impairments. Third, Curry argues that the ALJ erred by concluding that she could perform a full range of light work; Curry contends that her impairments restrict her even more than the ALJ concluded. Finally, Curry argues that the ALJ erred when she determined that there were jobs available in the economy for her by exclusively relying on the Medical-Vocational Guidelines and not a vocational expert.

**A.   Consultative Examination or Residual Functional Capacity Assessment**

First, Curry contends that the ALJ erred when she entered her decision denying Curry SSI benefits without obtaining a consultative examination and a residual functional capacity assessment. During the analysis of Curry's claim, the ALJ noted:

> I find, based on the record evidence, that the claimant does have severe impairments . . . which limit her to the full range of light work. It is noted that there are no treating physicians' opinions regarding the claimant's physical abilities nor are there any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those

> determined in this decision.  The claimant has had minimal
> treatment for her complaints.

(R. 21).  Curry argues that this statement shows that the ALJ did not have sufficient information to render the decision and therefore should have requested additional medical review.

In certain cases, ALJs have the ability to request additional medical records or a medical review of the claimant.  For instance, an ALJ has the power to request that the claimant undergo a consultative examination where the information needed to make a disability determination is not "readily available from the records."  20 C.F.R. § 416.912(f); see also 20 C.F.R. § 416.919a(a)(1); 20 C.F.R. § 416.919a(b).  However, an ALJ's obligation to seek additional medical evidence exists only where "there is insufficient medical documentation or if the medical documentation is unclear."  Ferguson v. Schweiker, 765 F.2d 31, 36 n.4 (3d Cir. 1985).

Curry's argument misreads the ALJ's statement.  The ALJ distinguished between those physicians who were treating Curry, as opposed to those who only examined her.  The ALJ accurately noted that there were "no treating physicians' opinions regarding the claimant's physical abilities." (R. 21).  While Curry offered medical records from several visits to her primary care doctor, Dr. Jon Shapiro, none of those records contained an opinion on whether Curry's impairments constituted a disability or the extent of the physical impairments.

However, Curry's repeated visits to the Graduate Hospital ER provided physicians with several opportunities to consider both Curry's physical impairments and the extent to which they hindered her physical abilities, including her abilities as a result of the neuropathy.  On at least two of those visits after Curry's admission of June 14, 2004, examining physicians evaluated

Curry's motor abilities and concluded that they were normal.[3] There was also sufficient evidence concerning Curry's past complaints of back pain, indicating that it did not limit her physical abilities and were isolated occurrences.[4] Curry's own statements in her application concerning her physical abilities also provided evidence of the extent of the physical impairments.[5]

The same is true for Curry's impairment of COPD. Her repeated visits to the ER provided examining medical staff with several opportunities to evaluate complaints of difficulty breathing.[6] With the medical records from these visits, the ALJ had significant evidence to support a conclusion that Curry's breathing was typically not disabling beyond the capabilities of

---

[3] See (R. 124) (documenting physical evaluation indicating normal respirations, normal gait and station, normal motor strength, and an adequate range of motion on Curry's August 6, 2005 visit to the ER); (R. 200) (documenting physical evaluation indicating normal gait, station, and motor strength on Curry's March 15, 2006 visit to the ER).

[4] See (R. 90) (documenting opinion that Curry's back pain was due to pneumonia on October 25, 2003 visit to the ER); (R. 119, 122) (documenting physical evaluation of August 6, 2005 ER visit indicating that Curry did not have any tenderness in her back despite complaint of back pain, and instructing Curry to rest, heat her back, and take pain medication); (R. 199) (diagnosing Curry's pains and cough as symptoms of pneumonia during March 15, 2006 visit).

[5] See, e.g., (R. 61, 67) (admitting that she can dress herself without resting, shower without resting, dial a regular telephone, use a knife and fork, fasten buttons, and can tie her shoes).

[6] During her first visit on record, Curry arrived at the ER with complaints of pain and shortness of breath. (R. 89). Despite an initial diagnosis of COPD exacerbation (R. 89), the ER diagnosed and treated Curry for pneumonia (R. 90). At discharge, Curry notified the medical staff that the treatment for pneumonia had improved her condition and that her shortness of breath had "significantly subsided." (R. 90). On her June 13, 2004 visit to the ER, the medical staff observed no respiratory abnormalities. (R. 133). During her July 14, 2004 admission, Curry's shortness of breath was diagnosed as being caused by pseudomonas and cured with several medications and treatments. (R. 144). At Curry's August 19, 2004 visit with Dr. Shapiro, he noted that Curry's lungs were clear. (R. 192). During Curry's August 6, 2005 visit to the ER, the staff similarly recorded her respirations as normal. (R. 124). Finally, on March 15, 2006, Curry's pains and her cough were also diagnosed as pneumonia, for which she was treated with antibiotics. (R. 199).

a light work load; where Curry did have trouble breathing, those instances were diagnosed and treated as isolated cases of pneumonia.

Finally, Curry's visits also allowed the examining medical staff to conduct extensive evaluations of her cardiac status.  Besides Curry's first visit to the hospital in 2003 (prior to when she states she first became disabled), Curry had several cardiac evaluations by the examining physicians, which generally provided normal results.[7]  The record also includes Curry's treating physician's opinion on her blood pressure.  See (R. 222) (during routine examination on August 24, 2006, treating physician noted that Curry's high blood pressure was "well controlled").

Even when this Court provided Curry with an opportunity to offer additional evidence due to not being initially represented by counsel at the administrative level, Curry presented no additional useful medical evidence.  In her initial brief in support of her Motion for Summary Judgment, Curry specifically argued that the ALJ should have either "order[ed] a consultative examination to evaluate Plaintiff's physical capacity, or, in the alternative, [contacted] Dr. Shapiro, Plaintiff's treating doctor, to ask him to assess Plaintiff's ability to perform work-related activities."  (Doc. 8 at 13).  After provided the opportunity to present this additional medical evidence, Curry only submitted additional medical records that contained statements by Dr.

---

[7] See (R. 92) (finding that, while Curry may have had a somewhat abnormal heart rhythm during her first visit to the ER on October 25, 2003, she also admitted to using crack cocaine that same day which could have affected the results); (R. 133) (no cardiac abnormalities observed during Curry's visit to the ER on June 13, 2004); (R. 160, 168-75) (no cardiac abnormalities observed during Curry's hospital admission starting on June 14, 2004, after medical staff performed a stress test, cardiac catheterization, and multiple EKGs); (R. 124) (normal cardiovascular examination during Curry's visit to the ER on August 6, 2005); (R. 204-05) (no cardiac abnormalities observed with EKG during Curry's March 15, 2006 visit to the ER other than a fast heartbeat).

Shapiro referring her for hepatitis B treatment and a letter by Dr. Shapiro stating that he could not opine on whether Curry is disabled.  (Doc. 14).

The records that Curry provided to the Commissioner and to the ALJ contained sufficient and substantial evidence for the ALJ to come to a conclusion on Curry's physical abilities without the need for an additional evaluation.  Since the medical records and evidence recorded by the examining medical staff and physicians of Graduate Hospital ER were sufficient to show the physical status and abilities of Curry, the ALJ did not err in not seeking an additional consultative examination.

      **B.**     **ALJ's Finding that Plaintiff's Statements Were Not Credible.**

Curry next contends that the ALJ inappropriately dismissed her subjective complaints concerning her limitations and that the dismissal was not supported by substantial evidence.  In the ALJ's decision, she found that, "[a]fter considering the evidence of record, . . . the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  (R. 20).  In her SSI application, Curry made several complaints about how her disabilities, which she noted as an irregular heartbeat, asthma, hepatitis C (R. 49), and pain in her feet (R. 58), limited her involvement in "nearly everything" (R. 66).  While the ALJ did find that Curry had the severe impairments of COPD, neuropathy of the feet, and back pain, she also found that Curry was not prevented from doing "nearly everything" as Curry claimed but could engage in a full range of light work.  (R. 19).

A core function of the ALJ's role is to make credibility determinations on the evidence in the record, including the statements and complaints made by claimants.  <u>Van Horn v. Schweiker</u>,

717 F.2d 871, 873 (3d Cir. 1983). The power to make these credibility determinations, however, is not unlimited. This is particularly true for purposes of the subjective complaints of symptoms made by claimants. Where the claimant complains of her symptoms, including pain, those complaints "must be seriously considered, even where not fully supported by objective medical evidence. Where such complaints are supported by medical evidence, the ALJ may not discount them without contrary medical evidence." Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987); see also Mason v. Shalala, 994 F.2d 1058, 1067-68 (3d Cir. 1993) ("Where medical evidence does support a claimant's complaints of pain, the complaints should then be given 'great weight' and may not be disregarded unless there exists contrary medical evidence.").

Despite Curry's assertion that her medical impairments are "consistently" supported by the medical evidence, a thorough analysis indicates that the ALJ's finding, that Curry was not more limited in her work ability as suggested by her subjective complaints, was adequately supported by the record. As will be discussed in the next section, substantial evidence existed in the record to support the ALJ's conclusion that Curry's actual residual functional capacity was a light work load, contrary to her subjective complaints.

    **C.**    **ALJ's Conclusion of Plaintiff's Ability to Perform Light Work**

Next, Curry contends that the ALJ erred when she concluded that Curry's impairments of COPD, neuropathy, and back pain limit her to the residual functional capacity of a full range of light work. (R. 20). In arguing that there was not substantial evidence in the record to support such a finding, Curry highlights both the statements made by her in the SSI benefits application that she had serious problems engaging in exertional activities and the diagnosis of neuropathy made during her visit to the ER on June 14, 2004. While Curry did make several statements that

would indicate an impairment more severe than the ALJ's finding, the medical evidence that Curry submitted provides substantial evidence for the ALJ's conclusion.

The only piece of medical evidence indicating that Curry had trouble with exertional activities was the diagnosis of neuropathy during her June 14, 2004 visit. However, there are several problems with arguing that this neuropathy and the other impairments amount to a disability for Curry.[8] First, the records indicate that, while Curry was diagnosed with neuropathy, the medical staff concluded that the neuropathy was "likely secondary to her untreated hepatitis C status." (R. 144). Throughout the medical records, the medical staff treating Curry have repeatedly encouraged her to seek treatment for her hepatitis C.[9] There are no medical records, however, that suggest that Curry ever followed those instructions. Where a condition is able to be controlled with medication or other treatment, that condition will not be considered disabling. See Brown v. Bowen, 845 F.2d 1211, 1215 (3d Cir. 1988).

Second, even if Curry did have a persistent neuropathy after her June 14, 2004 diagnosis, there is substantial evidence in the record to indicate that the condition did not significantly limit her after the June 14 visit. For instance, on June 7, 2005, Dr. Shapiro noted that Curry had "no fatigue." (R. 190). During Curry's August 6, 2005 ER visit, the medical staff noted that Curry

---

[8] While the medical staff that treated Curry on her June 14, 2004 visit did diagnose Curry with neuropathy, that diagnosis was made after Curry complained of weakness and being unable to walk in the prior 3-4 days. (R. 143, 146). This complaint is at least somewhat incredible given that only one day before her admission, while Curry was in the ER, the medical staff indicated that Curry's gait, station, sensation, and motor strength were all normal. (R. 133).

[9] See, e.g., (R. 221) (Dr. Shapiro instructing Curry to seek hepatitis C treatment during an examination on August 28, 2006); (R. 223) (Dr. Shapiro instructing Curry to seek hepatitis C treatment during an examination on February 3, 2006); (R. 190) (Curry refused treatment for hepatitis C during an examination by Dr. Shapiro on June 7, 2005); (R. 144) (Graduate Hospital ER instructing Curry to seek hepatitis C treatment during her ER discharge on July 19, 2004).

had normal gait and station, normal motor strength, and an adequate range of motion. (R. 124). On March 15, 2006, Curry had no problems with her gait, station, or motor strength. (R. 200).

Next, the ALJ also found that the Curry had back pain, which constituted a physical impairment. However, there is substantial evidence on the record supporting the ALJ's conclusion that the incidents of back pain do not limit Curry's physical abilities any more than a light work load. For instance, during Curry's October 25, 2003 visit to the ER, one of her chief complaints was back pain accompanied with her shortness of breath. (R. 89). However, over several tests, the medical staff determined that the back pain was due to pneumonia and treated it with steroids and antibiotics. (R. 90). During the other visit when Curry complained of back pain on August 6, 2005, a physical evaluation indicated that Curry had a normal gait and station, normal motor strength, no tenderness in her back, and an adequate range of motion. (R. 124). After being discharged with instructions to rest and take some pain medications (R. 122), there is no evidence that Curry ever sought subsequent treatment for back pain. And a later evaluation on March 15, 2006 indicated that Curry's motor abilities were normal. See (R. 200).

The ALJ's conclusion that Curry was not disabled by her COPD or asthma is also supported by substantial evidence, as discussed in the section for Curry's first objection.[10]

---

[10] See, e.g., (R. 89, 90) (indicating that, during Curry's October 25, 2003 visit to the ER, Curry's shortness of breath was diagnosed and treated as pneumonia, and Curry reported that the symptoms had "significantly subsided" after the pneumonia treatment); (R. 133) (indicating that, on Curry's June 13, 2004 visit to the ER, the medical staff observed no respiratory abnormalities); (R. 144) (indicating that, during the July 14, 2004 admission, Curry's shortness of breath was diagnosed as being caused by pseudomonas and cured with several medications and treatments); (R. 192) (noting that, during a routine examination with Dr. Shapiro, Curry's lungs were clear); (R. 124) (noting that, during Curry's August 6, 2005 visit to the ER, her respirations were normal); (R. 199) (noting that, on March 15, 2006, Curry's pains and her cough were diagnosed and treated as pneumonia).

Next, Curry also alleges that her irregular heartbeat and high blood pressure constitute a disability. (R. 49-50). Contrary to Curry's contention, however, there is substantial evidence in the record that Curry does not have an irregular heartbeat. Curry's first visit to the ER on October 25, 2003 was the only point where the medical staff indicated that she may have had a somewhat abnormal heart rhythm. (R. 92) However, when Curry was checked into the hospital, she also admitted to using crack cocaine that same day, which could have altered the results of the EKG.[11] Other than the EKG taken on October 25, 2003, prior to when Curry even claims her disability began and taken shortly after Curry had used crack cocaine, each cardiac examination in the record indicated that Curry did not have an irregular heartbeat.

Finally, other than the above physical impairments, Curry also contends that there is sufficient evidence in the record that her hepatitis C and her substance abuse establish a disability. However, Curry points to no medical evidence establishing that these two conditions, other than discussed above, amount to a physical impairment or disability

The ALJ's conclusion that Curry's impairments limited her to a light work load is supported by substantial evidence in the record.

**D.    ALJ's Finding of Job Availability for Plaintiff Without Vocational Expert**

Finally, Curry contends that the ALJ erred when she determined that, based upon Curry's age, education, work experience, and her residual functional capacity, "there are jobs in

---

[11] During Curry's visit to the ER on June 13, 2004, the medical staff also did not observe any cardiac abnormalities. (R. 133). On Curry's visit starting on June 14, 2004, a stress test, cardiac catheterization, and her EKGs indicated no cardiac abnormalities. (R. 160, 168-75). During Planitiff's visit to the ER on August 6, 2005, she again had a normal cardiovascular examination. (R. 124). Finally, an EKG taken during Curry's March 15, 2006 visit to the ER also indicated a normal rhythm and no irregularities other than a fast heartbeat. (R. 204-05).

significant numbers in the national economy" that Curry could perform according to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2. (R. 21-22). Curry argues that the ALJ's finding without the testimony of a vocational expert amounted to reversible error.

The Medical-Vocational Guidelines ("Guidelines") at issue are utilized by the Commissioner in order to determine whether jobs are available in the economy for a claimant based upon the claimant's age, education, work experience, and any exertional disabilities. Rather than requiring the testimony of a vocational expert in every case, the Guidelines permit a finding as to whether jobs exist without a case-by-case analysis. See Heckler v. Campbell, 461 U.S. 458, 467-68 (1983) (holding that, in considering a challenge to the use of the Guidelines to establish the availability of jobs in the economy, "[t]his type of general factual issue may be resolved as fairly through rulemaking as by introducing the testimony of vocational experts at each disability hearing"); see also Allen v. Barnhart, 417 F.3d 396, 402-03 (3d Cir. 2005) (recognizing Heckler and that "the Commissioner can satisfy its burden of proof regarding availability of jobs in the national economy via rulemaking rather than requiring actual evidence on a case-by-case basis"). However, there are certain limitations on an ALJ's use of the Guidelines to establish the availability of jobs in the economy. For instance, as Curry recognizes, an ALJ may not use these Guidelines in order to determine whether jobs exist in the national economy where a claimant's impairments are not solely exertional. See Sykes v. Apfel, 228 F.3d 259, 267 (3d Cir. 2000) ("The courts of appeals agree at a general level that the grids cannot automatically establish that there are jobs in the national economy when a claimant has severe exertional and nonexertional impairments.").

Impairments can be categorized for purposes of an SSI disability analysis as exertional or nonexertional. "Limitations are classified as exertional if they affect [a claimant's] ability to meet the strength demands of jobs." 20 C.F.R. § 416.969a(a). On the other hand, "[l]imitations or restrictions which affect your ability to meet the demands of jobs other than the strength demands, that is, demands other than sitting, standing, walking, lifting, carrying, pushing or pulling, are considered nonexertional." 20 C.F.R. § 416.969a(a). "The nature of the claimant's limitations-not his diagnosed impairments or symptoms-determines whether the limitations are considered exertional or nonexertional." Forsythe v. Astrue, 2008 WL 4279573, at *9 (W.D. Pa. 2008). Several examples of nonexertional limitations are provided. Curry in particular highlights two of those examples as applicable to her own impairments:

> (v) You have difficulty tolerating some physical feature(s) of certain work settings, e.g., you cannot tolerate dust or fumes; or
> (vi) You have difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching.

20 C.F.R. § 416.969a(c)(v)-(vi).

First, Curry argues that one of her impairments, COPD, was nonexertional since it created difficulty for Curry if exposed to "dust or fumes." Curry points to two pieces of evidence which, she argues, indicate the severity and extreme limitations that COPD puts on her nonexertional abilities: that she claimed she used albuterol four times daily in her SSI application (R. 79); and that an X-Ray and CT scan revealed lung abnormalities (R. 181, 206). While admittedly COPD at its extremes could impose a decreased tolerance for dust or fumes, there is substantial evidence in the record that Curry's COPD did not rise to such an extreme. Curry does not point to any place in the record where Curry was given or taking medication for an extreme version of COPD.

On Curry's most recent visit to the ER on March 15, 2006, there was no evidence that she notified the medical staff that she was on any medication, including albuterol. While she was admitted to treat a cough, the ER diagnosed and treated Curry for pneumonia. (R. 199). During her visit to the ER on August 6, 2005, the records again do not indicate that Curry informed them of any current medication that she was taking, including medication for her COPD. Curry, being admitted for back pain, had normal respirations and no cardiac abnormalities. (R. 124). During Curry's more extensive visit to the ER starting June 14, 2004, her breathing troubles were attributed to, and she was treated for, pseudomonas. (R. 144). Finally, none of Curry's regular visits with her primary care physician, Dr. Jon Shapiro, indicate any concern with COPD, let alone an extreme version of the disease. These medical records provide substantial evidence to indicate that, while Curry may have COPD, it does not rise to the level of a nonexertional impairment.

  Next, Curry also contends that neuropathy in her upper extremities amounted to a nonexertional impairment in that she had difficulty with "manipulative or postural functions." In support, Curry points to her answer in the SSI application that she had pain in her hands "at times" and that she was diagnosed with neuropathy during her June 14, 2004 visit to the hospital. First, Curry fails to recognize that, while the ALJ concluded that Curry had an impairment of neuropathy, the neuropathy was of the feet, not the hands. (R. 19). And presuming that Curry is therefore challenging the ALJ's finding that Curry does not have neuropathy of the hands, there is substantial evidence in the record to support that finding. During Curry's initial meeting at the Field Office, the staff member noted that Curry did not have any trouble using her hands or writing. (R. 56). Similarly, in her application for benefits, Curry stated that she had no problem

dialing a regular telephone, using a remote control, using a knife and fork, fastening buttons, and tying shoes. (R. 61). Finally, while Curry was diagnosed with neuropathy during her June 14, 2004 visit to the hospital, the subsequent records show no evidence of any limitations caused by the neuropathy, either of the hands or feet.[12] In short, Curry fails to show that there was any evidence to suggest neuropathy of her hands, particularly in light of Curry's contemporaneous admission in her SSI application that she had no trouble with her hand usage. (R. 56).

Finally, Curry points to no evidence to suggest that her back pain imposed a nonexertional impairment, and this Court can find none. The ALJ's implicit conclusion that Curry's impairments were exclusively exertional is supported by substantial evidence on the record. Therefore, the ALJ did not err in relying on the Guidelines in determining whether Curry was disabled.

An appropriate Order follows.

---

[12] On three subsequent visits with Dr. Shapiro after the June 14, 2004 hospital admission, Dr. Shapiro did not mention the neuropathy or any muscle weakness. (R. 192, 191, 190). On the last of those visits, June 7, 2005, Dr. Shapiro even noted that Curry was experiencing "no fatigue." (R. 190). During Curry's August 6, 2005 visit to the ER, the medical staff noted that Curry had normal gait and station, normal motor strength, and an adequate range of motion. (R. 124). And during Curry's most recent visit to the ER on March 15, 2006, the staff again noted that Curry had no abnormalities in gait, station, and motor strength. (R. 200).

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FAYE E. CURRY | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MICHAEL J. ASTRUE, | : | No. 07-5237 |
| COMMISSIONER OF THE | : | |
| SOCIAL SECURITY ADMINISTRATION | : | |

## **ORDER**

AND NOW, this 26th day of January, 2009, upon careful and independent consideration of Plaintiff Faye E. Curry's Motion for Summary Judgment, and review of the record, it is hereby ORDERED that:

(1) Plaintiff's Motion (Doc No. 8) is DENIED;

(2) Judgment is hereby entered in favor of Defendant and against Plaintiff; and

(3) The clerk shall mark this case CLOSED for statistical purposes.

BY THE COURT:

/s/ Michael M. Baylson
Michael M. Baylson, U.S.D.J.

O:\CIVIL 07-08\07-5237 Curry v. Astrue\07-5237 Curry v. Astrue - Memo Re SJ Motion.wpd